Barry Melton, Esq.
California Bar #104700
PO Box 116
Petaluma, CA 94953-0116
530-304-9192
thefish@counterculture.net

Luke Busby, Esq.
Nevada Bar #10319
316 California Avenue
Reno, Nevada 89509
(775) 453-0112
luke@lukeandrewbusbyltd.com
*Admitted Pro Hac Vice*

Michael S. Biggs, Esq.
California Bar #237640
Biggs Law Office
319 Lennon Lane
Walnut Creek, CA 94598
(925) 933-1300
michaelbiggs@biggslawoffice-apc.com

*Attorneys for the Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE ESTATE OF LEON SCHMIDT, through CO-ADMINISTRATORS GARY SCHMIDT and CAROL ADAMS, GARY SCHMIDT, an individual, CAROL ADAMS, an individual, AND SHERI FIHN, an individual.<br><br>Plaintiffs,<br><br>v. | Case No.: 3:25-cv-06731-MMC<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES: FIRST CAUSE OF ACTION — VIOLATION OF FOURTH AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983; SECOND CAUSE OF ACTION — SUBSTANTIVE DUE PROCESS VIOLATION — FOURTEENTH AMENDMENT UNDER 42 U.S.C. § 1983; THIRD CAUSE OF ACTION —** |

THE CITY OF AMERICAN CANYON,THE COUNTY OF NAPA, JOSEPH CHERRY, individually, and REBECCA BROCKMAN, individually, and DOES 1-50, inclusive.

Defendants.

**ELDER ABUSE — WELF. & INST. CODE §§ 15600 ET SEQ.; FOURTH CAUSE OF ACTION — NEGLIGENCE — WRONGFUL DEATH — CAL. CODE CIV. PROC. § 377.60; FIFTH CAUSE OF ACTION — BREACH OF FIDUCIARY DUTY — CAL. PROB. CODE §§ 2101 ET SEQ.; SIXTH CAUSE OF ACTION — TAKINGS CLAUSE VIOLATION — FIFTH AMENDMENT UNDER 42 U.S.C. § 1983; SEVENTH CAUSE OF ACTION — PROCEDURAL DUE PROCESS — FOURTEENTH AMENDMENT UNDER 42 U.S.C. § 1983; EIGHTH CAUSE OF ACTION — CONVERSION; NINTH CAUSE OF ACTION — SURVIVAL ACTION — CODE CIV. PROC. § 377.34**

**JURY TRIAL DEMAND**

COMES NOW, THE ESTATE OF LEON SCHMIDT, through CO-ADMINISTRATORS GARY SCHMIDT and CAROL ADAMS, GARY SCHMIDT, an individual, CAROL ADAMS, an individual, AND SHERI FIHN, an individual, ("Plaintiffs") by and through the undersigned counsel, and hereby files the following Second Amended Complaint seeking redress for the violation of rights under the United States Constitution and for state law claims against THE CITY OF AMERICAN CANYON, THE COUNTY OF NAPA, JOSEPH CHERRY, individually, and REBECCA BROCKMAN, individually, and other unidentified Defendant DOES 1-50 ("Defendants").

## JURISDICTION AND VENUE

1. This Court has jurisdiction over Plaintiffs' claims arising under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §

1983 pursuant to 28 U.S.C. §§ 1331 and 1343. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiffs' claims arising under state law, because those claims form part of the same case or controversy as the federal claims.

2. Venue is proper in the Northern District of California because the acts and omissions giving rise to Plaintiffs' claims occurred in Napa County, California, within this District.

PARTIES

3. Plaintiff THE ESTATE OF LEON SCHMIDT brings its claims through its Co-Administrators Gary Schmidt and Carol Adams, duly appointed as such. The Estate asserts, among other things, the causes of action that belonged to Decedent Leon Schmidt before his death, which were not lost by reason of his death and which are asserted by the Estate pursuant to California Code of Civil Procedure § 377.34.

4. Plaintiff GARY SCHMIDT is an individual, a resident of the State of Nevada, Co-Administrator of the Estate of Leon Schmidt, and heir and sibling of the decedent, Leon Schmidt.

5. Plaintiff CAROL ADAMS is an individual, a resident of the State of California, and heir and sibling of the decedent, Leon Schmidt.

6. Plaintiff SHERI FIHN is an individual, a resident of the State of California, and heir and sibling of the decedent, Leon Schmidt.

7. Defendant CITY OF AMERICAN CANYON is a municipal corporation organized and existing under the laws of the State of California, located in Napa County, and is responsible for the actions, policies, practices, and customs of its employees and agents, including those involved in code enforcement and related activities under California Government Code § 815.2.

8. Defendant COUNTY OF NAPA is a political subdivision of the State of California, responsible for the actions, policies, practices, and customs of its employees and agents, including those involved in conservatorship proceedings, public guardianship, and related activities under California Government Code § 815.2.

9. Defendant JOSEPH CHERRY is an individual who, at all times relevant to this Complaint, was employed by or acting on behalf of Defendant THE COUNTY OF NAPA related to conservatorship matters, including as Assistant Public Guardian. Defendant JOSEPH CHERRY is sued herein in his individual capacity for acts and omissions taken under color of state law.

10. Defendant REBECCA BROCKMAN is an individual who, at all times relevant to this Complaint, was employed by or acting on behalf of Defendant THE COUNTY OF NAPA as Deputy Public Guardian/Administrator. Defendant REBECCA BROCKMAN is sued herein in her individual capacity for acts and omissions taken under color of state law.

11. At all times relevant hereto, the individual Defendants JOSEPH CHERRY and REBECCA BROCKMAN were acting under color of state law and within the course and scope of their employment or agency with Defendant THE COUNTY OF NAPA.

12. At all times relevant hereto, Defendant JOSEPH CHERRY was the official with final decision-making authority for Defendant COUNTY OF NAPA with respect to the establishment, administration, and management of conservatorships by the Public Guardian's office, including the decision to petition for the conservatorship of Decedent Leon Schmidt's estate, the decision not to seek a conservatorship of the person, the setting of Decedent Leon Schmidt's personal allowance, the decision whether to fund and implement housing for Decedent Leon Schmidt, and the liquidation, disposition,

and management of the assets of the conservatorship estate. Defendant CHERRY personally received and responded to the referrals concerning Decedent Leon Schmidt, personally communicated with the CITY OF AMERICAN CANYON's attorney and code enforcement personnel, personally spoke with Decedent Leon Schmidt in March, April, and May of 2023, personally received the September 5, 2023 housing plan described below, and personally made the decision that the Public Guardian would seek conservatorship of the estate only. Defendant CHERRY's decisions in these respects were not subject to review, approval, or countermand by any other County official or policymaking body, and his acts and decisions therefore constituted the official policy of Defendant COUNTY OF NAPA.

13. Defendant CITY OF AMERICAN CANYON collaborated with Defendant COUNTY OF NAPA in pursuing and implementing the conservatorship over Decedent Leon Schmidt, such that the actions of each entity and its agents were undertaken as part of a joint effort, rendering each Defendant vicariously liable for the acts and omissions of the others as principals and agents in furtherance of their shared objectives related to code enforcement, property abatement, and conservatorship management.

14. Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 50, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by their conduct.

15. Plaintiffs are informed and believe that at all times herein mentioned, each of the Defendants was the agent, servant, and/or employee of the remaining Defendants,

and at all times herein mentioned, were acting within the course and scope of their agency and employment with said principal and/or employer.

16. At all times mentioned herein, the defendants DOES 26 through 50, inclusive, and each of them, were the co-joint-venturers, masters and employers of the remaining Defendants, and each of them, who, at all times herein mentioned, were acting within the course and scope of their agency, employment and/or joint venture.

17. Plaintiffs are informed and believe that at all times here mentioned, certain of the Defendants DOES are the successors in interest to each of the remaining Defendants and on that basis, are liable for any act, or omission of said Defendants alleged here.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

18. Plaintiffs timely presented their claims to Defendant THE CITY OF AMERICAN CANYON pursuant to California Government Code § 910 et seq. on or before December 28, 2024, with claims filed by Sheri Fihn, the Estate of Leon Schmidt, Gary Schmidt, and Carol Adams; all such claims were rejected by THE CITY OF AMERICAN CANYON by Notices of Rejection of Claim dated February 13, 2025. See Exhibits 2, 3, 4 and 5.

19. Plaintiffs timely presented their claims to Defendant NAPA COUNTY pursuant to California Government Code § 910 et seq., on or before December 28, 2024, with claims filed by Sheri Fihn, the Estate of Leon Schmidt, Gary Schmidt, and Carol Adams; all such claims were rejected by NAPA COUNTY on February 12, 2025. See Exhibits 6, 7, 8, and 9.

20. Accordingly, Plaintiffs have complied with and exhausted all administrative remedies required under California Government Code §§ 905 et seq. prior to filing this action. The claims presented to the City and the County described the

events at the Property and the conservatorship, including the seizure and disposal of Decedent Leon Schmidt's personal property, and therefore fairly reflect each of the state-law causes of action asserted herein, including the cause of action for conversion.

## STATEMENT OF FACTS

21. There were five siblings in the Schmidt family. Sheri Schmidt Fihn born in December of 1956, Steven Schmidt born in April of 1951, Gary Schmidt born in July of 1943, and Carol Schmidt Adams born in June of 1942, and Decedent Leon Dale Schmidt born on August 22 of 1939, who passed away on June 29, 2024 at the age of 84.

22. Leon "Lee" Schmidt was in the wholesale and retail stationery business for over 50 years including Neff's retail stationery store in downtown Napa for over 20 years.

23. Lee was a college graduate with a BA in Accounting and had been employed at I.B.M. after graduating from college.

24. He had also worked at Dana Street Stationery Store in Mt. View, California, a family retail stationery business owned by Al and Mary Schmidt, the parents of the 5 siblings, before starting his own wholesale stationery distribution business.

25. Lee maintained close relationships with his siblings although they all lived out of town. Carol Adams and Sheri Fihn spoke with Lee weekly and Gary Schmidt spoke with him monthly. Sheri Fihn, an experienced cardiac care nurse, helped Lee with his medical care. During adulthood, Leon lived with his brother Gary for a period of years and his sister Sheri for a period of years and resided with his brother Steven for many years before Steven’s passing. The family gathered on a regular basis for holidays, such as Easter, Thanksgiving, and Christmas, as well as on birthdays.

26. Lee bought his home at 106 Wilson Way in American Canyon, California in Napa County in the early 1990's (hereinafter "the Property").

27. The Property is a 1.2 acre pie shaped lot with the pointed end of the pie at a cul-de-sac type corner.

28. The bulk of the Property was barely visible from the street due to heavy vegetation and trees on the street. Also the house was right at the very front of the Property at the street and it provided a substantial visual screening to the 1 acre backyard.

29. Steven Schmidt moved in with Lee at his home on Wilson Way in American Canyon about the year 2000.

30. Starting in the early 2000s Steven and Lee began to get visits from code enforcement officers from THE CITY OF AMERICAN CANYON about the storage of materials on his large lot which could barely be seen by one looking down the driveway beside the house but could be seen by anyone entering the Property and going into the back yard.

31. The Plaintiffs are informed and believe that the Property was posted with "No Trespassing" signs. The Plaintiffs do not know whether there's ever been any citizen complaints about the Property.

32. Lee was an avid recycler and did have cans, cardboard, and other recyclable materials temporarily stored on his property and also had shelving and display racking used in his businesses stored there.

33. There was a barn and a free standing detached garage along with several sheds in the 1 acre back yard in which Lee had items stored and some inventory for his business.

34. There were several vehicles both operational and non operational parked in the one acre back yard of the Property.

35. Chickens and goats were also maintained on the Property as well as on occasion a cow and a couple of horses. To the best of the Plaintiffs' knowledge and belief, there was never a citation issued for any of the livestock.

36. The Property had a long history in regards to agriculture as it is believed to be an original farm house for a larger property prior to the development of the area into residences probably in the 1940s and 50s.

37. Lee received warning notices and some citations for the state of the property over the years and is believed to have taken corrective actions from time to time, but not to the total satisfaction of THE CITY OF AMERICAN CANYON.

38. Lee was also known to rescue unwanted dogs and or care for dogs while people were on vacation as a courtesy. There were most often several dogs on the Property who were Lee's personal pets.

39. In approximately 2010 Lee had suffered a near fatal heart attack and was in a coma for several days after which he finally recovered.

40. The Plaintiffs are informed and believe that after the 2010 medical event Lee's mental capacity and faculties began to deteriorate and he began to exhibit some behavior which to some might be considered eccentric such as an obsession with recycling.

41. On April 9, 2021, in the middle of the night, the house at 106 Wilson Way burned down and younger brother Steven perished in the fire along with one of Lee's dogs.

42. From that point forward Lee spent a lot of time on the Property sifting through the ashes trying to recover any salvageable treasures and also to gather scrap

metal from the ashes for recycling. He slept either in a camp trailer or in his car at or near the Property, without water, electricity, or sewer.

43. In or about October 2021, before any conservatorship, Lee himself contracted with a private abatement company, 1-888-Abatement, to clean up the fire remains on the Property. The Plaintiffs are informed and believe that the total contract price was approximately $70,000, that Lee paid approximately $40,000 of that amount, likely with insurance proceeds, and that the company later sued Lee for the balance. Approximately ten months after 1-888-Abatement performed its cleanup, THE CITY OF AMERICAN CANYON hired its own contractor, Central Valley Environmental, to clean the same Property, and billed Lee over $200,000 for it. Central Valley Environmental's own written report and photographs reflect that its work consisted of removing the remaining fire-damaged structure wall, the associated carport, and a red brick fireplace, along with outside yard cleanup — work duplicative of, and closely following, the cleanup Lee had already paid a private contractor tens of thousands of dollars to perform. Lee received no explanation of the City's charges, which the Plaintiffs have since learned included approximately $40,000 in attorney fees and approximately $20,000 in security costs, and the City recorded a lien against the Property for the $200,000. During the conservatorship, an agreement was reached for Lee to pay 1-888-Abatement $5,000 per month toward the private contract balance; several payments were made from the conservatorship estate, and 1-888-Abatement now asserts a claim against Lee's estate for approximately $25,000 plus attorney fees.

44. All three of Lee's surviving siblings offered for him to live in their homes or in properties they owned.

45. On or about June 2022 code enforcement of American Canyon began the process of filing an action ex parte with the Court to do a mandatory cleanup/clearing of Lee's property.

46. Code enforcement with THE CITY OF AMERICAN CANYON continued to issue citations to Lee even though they had knowledge and had admitted they knew of Lee's diminished mental capacity and that he was showing accelerated mental decline.

47. In about August of 2022 THE CITY OF AMERICAN CANYON consulted with outside legal counsel to consider seeking a court order for a mandatory cleanup/clearing of Lee's property.

48. The billing and communication records from American Canyon outside counsel show that around the August 2022 time period they also considered filing for placing Lee into a receivership or conservatorship by NAPA COUNTY because of Lee's diminished mental capacity and inability to make proper or rational decisions for himself.

49. The Plaintiffs are informed and believe that around August of 2022 THE CITY OF AMERICAN CANYON and the County of Napa were well aware of Lee's diminished mental capacity and had discussed as much.

50. In August of 2022 THE CITY OF AMERICAN CANYON filed two petitions in Superior Court requesting authority to hire outside contractors and have the Property cleaned/cleared and alleged nuisances abated.

51. American Canyon did not notify any relatives or siblings of Lee's about these hearings.

52. The Plaintiffs are informed and believe that Lee was not noticed and was not in attendance at the first hearing regarding the petition from American Canyon.

53. Lee appeared at the second hearing held regarding the petition from American Canyon and American Canyon allowed Lee to represent himself in Court despite his known diminished mental capacity.

54. THE CITY OF AMERICAN CANYON failed to disclose to the court the material facts regarding Lee's inability to handle his own affairs despite his known diminished mental capacity.

55. The Plaintiffs are informed and believe that in August and/or September of 2022 the Court issued an order and the City arranged for outside contractors to clean/clear and/or abate alleged nuisances at the Property. The Inspection Warrant and Abatement Order was issued by the Napa County Superior Court on July 29, 2022, was renewed on August 8, 2022, was extended on September 1, 2022 to September 18, 2022, and was extended on September 16, 2022 to September 25, 2022.

56. The Plaintiffs are informed and believe that during those activities they restrained Lee through the utilization of uniformed and armed law enforcement from observing the activities on the Property or taking any pictures of the activities on the Property, and then billed Lee approximately $20,000 for that security.

57. The Plaintiffs are informed and believe that during that "clean up" agents of THE CITY OF AMERICAN CANYON entered into the barn and garage and other structures on the Property and removed new merchandise and treasured family heirlooms from the structures and disposed of them without legal authority, as Lee's property inside the barn and garage were not subject to the cleanup order.

58. The Plaintiffs are informed and believe that there has never been any allegations or citations alleging violations within the structures such as the barn or garage and the structures were not subject to the Court order permitting the clean up.

59. Among the specific items of Lee's personal property that were seized and disposed of during the cleanup, and that did not constitute an accumulation of rubbish and trash, broken discarded household items, hazardous conditions, matters of sanitation, improperly stored vehicles, or other evidence of noncompliance with City, County, or State Codes within the meaning of the Abatement Order, was new, in-box, saleable business inventory stored in the barn. In the course of Lee's stationery business, inventory was regularly moved from his warehouse to the Property, and at the time of the cleanup the barn contained office furniture including four two-drawer lateral file cabinets and two four-drawer lateral file cabinets, brand new and still in their boxes; six office chairs of various levels, brand new and still in their boxes; and several used office desks. The 2021 fire did not reach the barn or the garage, and these items remained stored in the barn, undamaged, after the house was lost. The value of this new, in-box saleable merchandise was between $6,000 and $7,000. Brand new merchandise still in its original packaging is not, and cannot be, rubbish, trash, a broken discarded household item, a hazardous condition, or a matter of sanitation, and none of the enumerated categories of the Abatement Order reached it. Also taken was Leon’s treasured bicycle, which he rode to Central America when he was 19 years old.

60. The City billed Lee the exorbitant amount of over $200,000 for this cleanup/clearing of the Property including approximately $40,000 legal fees for the outside counsel they had hired, and approximately $20,000 for security.

61. Subsequently, the City of American Canyon continued to cite Lee for code violations after the cleanup/clearing and also began sending threatening foreclosure notices despite his known capacity issues and related failing physical health.

62. The actions of American Canyon contributed greatly to Lee's diminishing mental capacity and caused him great stress, mental pain, suffering, and anguish.

63. The Public Guardian first learned of Lee in the summer of 2022, when THE CITY OF AMERICAN CANYON called Adult Protective Services with concerns related to his living situation. The City contacted Defendant CHERRY again in March 2023 because of the large judgment against Lee, worried that if the City foreclosed or obtained a receiver, Lee would have nowhere to go. Defendant CHERRY spoke with the City attorney, code enforcement, Lee, Juan Martinez, and Brad Terrill (who was involved with the management of Lee's Lake County property), and spoke with Lee in March, April, and May of 2023.

64. In May and June of 2023 American Canyon had requested that NAPA COUNTY petition for conservatorship over Lee's estate based on their continuing belief that he was not able to make rational decisions for himself and their desire to recover the costs of the cleanup, despite knowing about Lee's diminished mental capacity for well over a year.

65. The Plaintiffs are informed and believe and thereupon allege that THE CITY OF AMERICAN CANYON's purpose for pursuing a conservatorship from NAPA COUNTY for Lee was to get Lee removed from his own property and eventually recover the costs associated with the cleanup from Lee's estate.

66. The Plaintiffs are informed and believe and thereupon allege that NAPA COUNTY's purpose for pursuing a conservatorship for Lee was to get Lee removed from his own property and to eventually recover the costs associated with the cleanup for American Canyon.

67. The Petition for Appointment of Probate Conservator ("the Petition") for Lee was filed on June 15, 2023 in Napa County Superior Court in Case No. 23-PR-000161, and sought an order authorizing administration of Lee's estate.

68. The Petition asserted in a checkbox marked 5(c)(1) that Lee was "unable to properly provide for his or her personal needs for physical health, food, clothing, or shelter" and in checkbox 5(c)(2) that Lee was "substantially unable to manage his or her financial resources or to resist fraud or undue influence."

69. The Petition also explicitly states in the Attachment that, "The conservatee is unable to understand what a conservatorship is."

70. Despite clear acknowledgement of Leon's diminished mental capacity and recognition of his medical issues in the petition itself as well as in communications obtained by the plaintiffs, the Defendants sought only control over the estate but not Lee's person.

71. By the sworn representations in the Petition, the County Defendants acknowledged that there existed an imminent threat to Lee's health or safety within the meaning of California Probate Code § 2920(a)(1), under which the public guardian "shall apply for appointment as guardian or conservator of the person, the estate, or the person and estate, if there is an imminent threat to the person's health or safety or the person's estate." Notwithstanding this mandatory duty, and notwithstanding their own representations that Lee could not provide for his personal needs for physical health, food, clothing, or shelter, the County Defendants sought and obtained only a conservatorship of the estate, deliberately declining to seek a conservatorship of the person or otherwise to secure his physical welfare, because the actual purpose of the conservatorship was collection of the City's abatement judgment.

72. In the Petition, Defendant NAPA COUNTY requested broad powers over Lee's estate, including managing mail, operating businesses, selling property without court confirmation, and providing a discretionary personal allowance up to $1,200 annually, while noting unknown estate values and the alleged inability to locate

relatives for notification. Plaintiffs dispute that NAPA COUNTY was unable to locate Lee’s relatives, but rather, did not do so intentionally.

73. The Plaintiffs do not believe that at any time any medical professional interviewed or examined Lee to determine the exact nature of his mental and physical health status, although his mental decline and failing health were obvious.

74. Lee's siblings never received notice of the Petition or of any of the hearings regarding the Petition for appointment of a conservator for Lee.

75. NAPA COUNTY has admitted it failed to provide notice to the family of the petition to appoint a conservator, which is plainly required by State law. The Superior Court, in its Order After Hearing filed June 9, 2025, expressly found that the Public Guardian admitted it failed to provide the notice required by Probate Code § 1822(a), and expressly found that all three of Lee's siblings would have attended the hearing had they known of it.

76. Defendant CHERRY has provided conflicting accounts about the reason why Lee's siblings were not notified of the Petition as required by state law, originally claiming that they couldn't be located, but later admitting that they were not notified because doing so would be against Lee's wishes.

77. At no time during this process did the County or the City notify any of Lee's relatives including but not limited to his siblings which were known to them about the Petition or hearings as is expressly required by law under California's Probate Code 1822(a-b).

78. This required notice must be served at least 15 days before the hearing (Probate Code 1821(a)), allowing family members to appear, object, propose alternatives, or seek appointment as conservator (Probate Code 1829).

79. Defendant JOSEPH CHERRY has claimed the reason they did not comply with the State law notification procedure is that Lee, who they were alleging did not have the mental capacity to make proper decisions for himself, asked them not to notify his siblings.

80. The Order Appointing Probate Conservator and Letters of Conservatorship, issued on July 24, 2023 and July 26, 2023 respectively in Napa County Superior Court Case No. 23-PR-000161, appointed the NAPA COUNTY Public Guardian, via Defendant CHERRY, Assistant Public Guardian, as conservator of the estate of Lee.

81. The Order authorized broad independent estate powers per the Probate Code, including operating businesses beyond 45 days, selling property without court confirmation (subject to certain conditions for the personal residence), borrowing money, leasing, and exchanging assets, with no bond required and the conservator restricted from taking possession of money or property without a specific court order.

82. The Order included powers to open Lee's mail for financial management, and to provide a discretionary personal allowance up to $1,200 annually if funds permit.

83. The Plaintiffs were never informed of the nature of the Order until after Lee's death.

84. The Order also states in checkbox 4(a) that Lee was "unable to properly provide for his personal needs for physical health, food, clothing, or shelter," and in checkbox 4(b) that Lee was "substantially unable to manage his or her financial resources or to resist fraud or undue influence." The Order provides in checkbox 6 that "[t]here is no form of medical treatment for which the conservatee has the capacity to give informed consent."

85. After issuance of the Order, Defendants had total control over Lee's finances, besides the $1,200 allowance for personal spending.

86. On September 5, 2023, within weeks of the establishment of the conservatorship, Brad Terrill, who helped Lee manage his Lake County properties, sent an email to Defendant CHERRY, copying Lee, in advance of a meeting with Lee at the Property scheduled for the following day. The email, produced by NAPA COUNTY in the Superior Court proceedings as SCHMIDT000248-249, set out a complete, sequenced plan to house Lee on his own Property: the Property would be cleaned up to the City's standards, with the insurance company to pay those costs; a negotiation would occur with the City over past costs and fees, with the insurance company to cover the negotiated settlement; a cleanup company would be hired and work started, with the insurance company to pay those costs; the City would issue permits for sewer, water, and electric hookups, with the insurance company to pay those fees; a four hundred square foot tiny home on wheels would be purchased with insurance funds and brought onto the site and hooked up to the utilities, with no foundation required; and, in the words of the email, "Lee moves in." Even if insurance finds were not available, Lee's estate had adequate resources to implement the housing plan, as described herein.

87. The September 5, 2023 email thus identified a specific sequence of executable steps, and presented them directly to the County official with final decision-making authority over Lee's finances, at the very inception of the conservatorship. The plan involved the one form of housing consistent with Lee's known and repeatedly expressed wish to remain on his own Property, and Lee, who was copied on the email and was to attend the meeting the following day, supported it.

88. The County Defendants never executed the plan. They did not clean the Property to the City's standards, did not negotiate the City's past costs and fees against

insurance proceeds, did not obtain permits for sewer, water, and electric hookups, and did not purchase or install the tiny home. Nine months later, on June 6, 2024 — eight days before his terminal hospital admission — Lee told hospital case management staff at Providence Queen of the Valley Medical Center that he was living in a van he was fixing up to live in on his property, with no running water and no electricity — still without the housing the plan would have provided.

89. Had the Plaintiffs been informed about the nature and extent of the conservatorship, as required by law, the Plaintiffs would have ensured that Lee's resources were used to provide Lee with adequate food, shelter, clothing, and medical care. Specifically, each of the three siblings had already offered Lee housing in their homes or in properties they owned, and each stood ready to renew and effectuate those offers with the backing and authority of the conservatorship court; Sheri Fihn, an experienced cardiac care nurse who had previously helped Lee with his medical care, would have monitored and arranged medical care for his conditions; the siblings would have appeared, objected, proposed alternatives, or sought appointment as conservator pursuant to Probate Code § 1829, and would have advocated for the application of Lee's substantial resources to his shelter, nutrition, and medical care; and the siblings would have insisted upon execution of the housing plan set out in the September 5, 2023 email, which required only the conservator's action to implement.

90. Although the Defendant JOSEPH CHERRY has claimed that Lee consented to the conservatorship, Lee lacked the capacity to do so.

91. Lee did not understand the nature of the conservatorship and conveyed to Gary Schmidt that he believed the entire point of the proceedings was to obtain an attorney to assist him with claims he had against THE CITY OF AMERICAN CANYON resulting from the code enforcement disputes described above — in other

words, to provide Lee with a defense to the code enforcement actions of THE CITY OF AMERICAN CANYON.

92. Based on his discussions with Lee (described above), Gary Schmidt believed that Lee was to receive some sort of legal aid to assist him with his difficulties with the City of American Canyon, as Lee never used the word "conservatorship" in his discussions with Gary about what was happening with NAPA COUNTY.

93. The Plaintiffs are informed and believe that the Order provided Lee with a paltry allowance from his own funds of $1,200 per year on which to survive.

94. Lee also owned two parcels in Lake County, California — a commercial property at 16175 Main Street, Lower Lake, and an adjacent parcel at 16125 Main Street, Lower Lake — together worth several hundred thousand dollars, which the County Defendants failed to marshal and which could have been marshaled, and sold, leased, or borrowed against, to fund housing, nutrition, and medical care for Lee during the conservatorship.

95. During the conservatorship, Lee survived by obtaining food from the charity of his neighbors, obtaining food from dumpsters, and local businesses that took pity on Lee.

96. The Plaintiffs are informed and believe that during the conservatorship, Defendant REBECCA BROCKMAN had primary responsibility to manage Lee's day to day financial affairs, however, it appears little to nothing was done to provide Lee with adequate food, shelter, or clothing.

97. Lee was taking showers at a local hotel or at neighbor’s homes when permitted, and washing up and using the bathroom of the local Safeway.

98. Both Carol, who lives in San Jose, and Sheri, who lives in San Diego, would visit Lee as often as practicable and try to assist him in finding alternative

housing that was suitable, but they were unaware that NAPA COUNTY had taken control over Lee's assets through the conservatorship.

99. Lee's medical records from Providence Queen of the Valley Medical Center document his physical decline immediately before and throughout the conservatorship, and document that his own treating providers repeatedly attributed that decline to his living conditions and deprivation.

100. During a hospital admission of April 8 through April 10, 2023 — before the conservatorship — Lee was treated for bilateral lower extremity cellulitis. His chronic kidney disease was at that time characterized in his medical records as stage II, mild, with a baseline creatinine of approximately 1.2 to 1.4. His treating physician documented that Lee's lower extremity edema was dependent edema in a patient who "does not lay flat at nights to sleep but in fact sits up in his car to get his sleep," and documented possible moderate protein calorie malnutrition "in a patient with poor social situation with possibly some food insecurity." Lee was discharged back to his car.

101. During a hospital admission of April 9 through April 11, 2024 — approximately nine months into the conservatorship — Lee's kidney function had measurably worsened. A nutrition-focused physical examination performed on April 11, 2024 documented severe muscle wasting at the clavicles and deltoids, moderate to severe muscle wasting at the temporalis and quadriceps, and moderate subcutaneous fat loss at the buccal and orbital fat pads and triceps. The hospital's formal nutrition diagnosis was: "Underweight related to food insecurity as evidenced by reports/observations, physical findings, BMI<23."

102. To the best of the Plaintiffs' knowledge and belief, during the course of the conservatorship, Lee had no substantive assistance from the conservator in obtaining

adequate medical care, nutrition, or housing to address his progressively worsening kidney disease, heart disease, malnutrition, and chronic wounds.

103. Plaintiffs are informed and believe that Leon's lack of resources hindered his ability to seek adequate medical care for the health problems he was having.

104. The Plaintiffs are informed and believe that the fact that Lee slept in an upright position in a car contributed substantially to his subsequent failed health.

105. On June 6, 2024, Lee presented to the emergency department at Providence Queen of the Valley Medical Center. The hospital's case management assessment that day documented that Lee was homeless and living in a van on his property with no running water and no electricity; that his income was approximately $1,000 per month in Social Security and $200 per month in EBT food benefits; that approximately $100,000 of his money was held in the conservatorship, which he was fighting to end; and that his judgment was impaired and he lacked insight into his situation — the very incapacities the County Defendants had sworn to in the Petition. Lee was discharged home the same day, his documented living situation being the van.

106. On June 14, 2024, Lee was admitted to Providence Queen of the Valley Medical Center and was treated in the intensive care unit until his death. His treating physicians' problem list and Discharge Death Summary, dated June 29, 2024, documented cachexia (a wasting syndrome) and severe protein calorie malnutrition; acute kidney injury superimposed on chronic kidney disease; acute on chronic liver failure; acute on chronic respiratory failure; acute on chronic heart failure; bilateral lower extremity cellulitis; and MRSA pneumonia. His treating intensivist described him as an "84-year-old gentleman with advanced multiorgan failure in the context of cachexia, severe protein calorie malnutrition, failure to thrive," and recorded that Lee "reportedly lived alone in a state of squalor," was "known to several of the staff at the

Queen as a gentleman who frequently is living in his car and frequently needs support in the way of nutrition from his neighbor," and had, in the words of the Discharge Death Summary, “an unfortunate history of progressive decline with severe protein calorie malnutrition, cachexia, failure to thrive,” including “a recent presentation with maggot infestation”. Despite renal replacement therapy, mechanical ventilation, and vasopressor support, Lee did not recover; he was transitioned to comfort care on June 28, 2024, and died at 2:00 p.m. on June 29, 2024.

107. The Certificate of Death for Leon Dale Schmidt, State of California, County of Napa, certified on July 10, 2024 by Brenda Joanne Marsh, M.D., with Bradley Wayne Schroeder, M.D. listed as the attending physician, states the cause of death as cardiovascular collapse, due to acute hypoxemic respiratory failure, due to cardiogenic shock, due to nonischemic cardiomyopathy, with the manner of death listed as natural. No autopsy was performed in determining the cause of death.

108. The Certificate of Death records the final physiologic mechanism of Lee's death. The contemporaneous records of the physicians who actually treated Lee during his terminal admission, including the Discharge Death Summary dated June 29, 2024, document that this terminal cardiovascular collapse occurred in, and arose from, the context of cachexia, severe protein calorie malnutrition, failure to thrive, and multiorgan failure — conditions of deprivation that developed and progressed during the conservatorship while the County Defendants controlled the resources that could have prevented them.

109. Plaintiffs are informed and believe, and thereon allege, that Lee's severe protein calorie malnutrition and cachexia, his unsheltered living conditions — including sleeping upright in a vehicle, substantially contributed to, and accelerated his chronic cardiac and renal conditions into the multiorgan failure and cardiovascular collapse

from which he died. Each of these conditions of deprivation was modifiable with the resources the County Defendants controlled, including the approximately $100,000 held in the conservatorship.

110. The Plaintiffs are informed and believe that Defendants NAPA COUNTY and CHERRY and BROCKMAN were aware of Lee's health problems and living conditions but only made trivial efforts to provide him with proper housing, food, and shelter, which greatly contributed to his failing health. Defendant CHERRY personally received the September 5, 2023 email describing the conditions on the Property and the plan to remedy them, and had personally met and spoken with Lee in March, April, and May of 2023. Defendant BROCKMAN knew that Lee had missed his cardiology appointments and was living in and driving his car, which was uninsured and unregistered.

111. In administering the conservatorship estate, the County Defendants took control of and, on January 4, 2024, seven days after gaining control of it, liquidated Lee's TD Ameritrade account; failed to marshal Lee's Lake County property so that it could be part of the conservatorship estate, despite Defendant BROCKMAN learning of the property in August 2023 and sharing that information with Defendant CHERRY.

112. Defendants CHERRY and BROCKMAN knew in June and July of 2023 that Lee had siblings.

113. Defendant CHERRY made a deliberate decision to disobey the law based upon a request by Lee that his family not be notified of the Petition, despite the fact that he deemed Lee to be mentally incompetent to make decisions for himself.

114. Subsequent to the appointment of CHERRY as conservator, Lee continued to live in his car on the property and was provided a paltry allowance on which he was expected to live, which was insufficient to cover basic food, clothing, and housing

needs, much less the significant sums needed to provide him with adequate medical care for his declining health.

115. Lee was unable to adequately care for himself, medically or otherwise, because the conservatorship removed his ability to access his finances.

116. Lee's health declined precipitously because of his lack of adequate medical care, housing, and food, which caused his death.

117. Lee spent the last months of his life living in absolute squalor despite having substantial resources which could have been used to provide adequate food, shelter, clothing, and medical care.

118. Just prior to the annual review of the conservatorship which would've been in August of 2024, Lee passed away in the hospital on June 29, 2024.

**DAMAGES**

119. Plaintiffs were physically, mentally, emotionally and financially injured and damaged as a proximate result of Decedent Lee's wrongful death, including, but not limited to, the loss of decedent's familial relationships, comfort, protection, companionship, love, affection, solace, and moral support.

120. Plaintiffs, as the surviving siblings and heirs at law of the decedent Leon Schmidt pursuant to Probate Code Section 6402(c), are entitled to recover wrongful death damages pursuant to California Code of Civil Procedure Sections 377.60 and 377.61.

121. In addition to these damages, Plaintiffs are entitled to recover for the reasonable value of funeral and burial expenses, pursuant to California Code of Civil Procedure Sections 377.60 and 377.61.

122. The conduct of the individual defendants was malicious, wanton, and oppressive. Plaintiffs are therefore entitled to an award of punitive damages against said individual defendants.

123. Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights, and the rights of decedent, under the law. Plaintiffs are therefore entitled to recover all attorneys' fees incurred in relation to this action pursuant to 42 U.S.C. Section 1988.

124. This action was commenced on August 8, 2025, before January 1, 2026. Accordingly, pursuant to California Code of Civil Procedure § 377.34(b), the damages recoverable by the Estate on Decedent's surviving causes of action include damages for pain, suffering, or disfigurement, in addition to all loss or damage that Decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that Decedent would have been entitled to recover had he lived, as provided in § 377.34(a). Pursuant to § 377.34(f), nothing in § 377.34 affects claims brought pursuant to Chapter 11 (commencing with Section 15600) of Part 3 of Division 9 of the Welfare and Institutions Code.

**FIRST CAUSE OF ACTION**

**(Violation of Fourth Amendment Rights Under 42 U.S.C. § 1983)**

**(Against Defendant THE CITY OF AMERICAN CANYON and DOES 1-50; By Plaintiff THE ESTATE OF LEON SCHMIDT)**

125. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as though fully set forth herein.

126. In doing the acts complained of herein, Defendants THE CITY OF AMERICAN CANYON and DOE Defendants, and/or each of them, acted under color of law to deprive Decedent Leon Schmidt of his constitutionally protected rights to be

free from unreasonable searches and seizures, as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. Specifically:

a. During the court-ordered cleanup in August and/or September 2022, agents of Defendant CITY OF AMERICAN CANYON and DOE Defendants conducted warrantless searches of structures on the Property, including the barn, garage, and other buildings, which were not subject to any allegations of code violations, citations, or the scope of the court order authorizing the abatement of nuisances;

b. These agents seized and disposed of Decedent Leon Schmidt's personal property, including new merchandise, treasured family heirlooms, and other items stored within these structures, without legal authority, probable cause, or a warrant, exceeding the permissible scope of any administrative inspection or abatement order;

c. Defendant CITY OF AMERICAN CANYON and DOE Defendants subjected Decedent Leon Schmidt to an unreasonable seizure of his person without justification, restraining his liberty through the show of authority of uniformed and armed law enforcement officers such that a reasonable person would not have felt free to leave or otherwise terminate the encounter, preventing him from accessing his property, observing the cleanup, or taking photographs, and the detention was not carried out in a reasonable manner.

127. Defendant CITY OF AMERICAN CANYON is liable for such conduct under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

128. As a proximate result of Defendants' conduct, Decedent Leon Schmidt suffered harm, including the loss and destruction of valuable property, emotional distress, and contributions to his declining health. These claims survive to the Estate pursuant to Code of Civil Procedure § 377.34, and Plaintiffs are entitled to attorneys' fees under 42 U.S.C. § 1988.

**SECOND CAUSE OF ACTION**

**(Substantive Due Process Violation - 14th Amendment under 42 U.S.C. § 1983)**

**(Against Defendants COUNTY OF NAPA, JOSEPH CHERRY, REBECCA BROCKMAN, and DOES 1-50; By Plaintiff THE ESTATE OF LEON SCHMIDT and Plaintiffs GARY SCHMIDT, CAROL ADAMS, and SHERI FIHN)**

129. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as though fully set forth herein.

130. Defendants Defendants JOSEPH CHERRY and REBECCA BROCKMAN, and DOE Defendants, acting under color of law, deprived Decedent Leon Schmidt of his liberty and property interests, and deprived Plaintiffs of their liberty interest in familial association, through conduct that shocks the conscience, interferes with rights implicit in the concept of ordered liberty, and offends the community's sense of fair play and decency.

131. Defendants' conduct is actionable under the state-created danger doctrine: by affirmatively taking complete control of Decedent Leon Schmidt's financial resources, providing him a token $1,200 annual allowance from his own funds, taking control of and liquidating his TD Ameritrade account, disposing of his personal property without court confirmation, declining to execute the housing plan presented directly to Defendant CHERRY in the September 5, 2023 email, and failing to apply his substantial assets and the available insurance proceeds to his shelter, nutrition, and care,

Defendants affirmatively placed Decedent in, and left him in, a position of danger — homelessness, documented severe protein calorie malnutrition, exposure, and progressive multiorgan decline — that he would not otherwise have faced, and did so with deliberate indifference to the known and obvious danger.

132. Defendants' conduct is independently actionable under the special-relationship doctrine: by petitioning for and obtaining a conservatorship over a man they represented under oath was unable to properly provide for his personal needs for physical health, food, clothing, or shelter, and unable even to understand what a conservatorship is, and by assuming exclusive control of the resources by which he could meet those needs, Defendants assumed a special relationship of dependency with Decedent Leon Schmidt.

133. Defendants JOSEPH CHERRY and REBECCA BROCKMAN showed deliberate indifference to the welfare of Leon Schmidt despite the known or obvious dangers to his health and welfare of depriving him of his financial resources and then using those resources to satisfy the debts rather than to care for his health or welfare, without regard to the consequences. Actual deliberation was practical throughout the prolonged, months-long course of the conservatorship; no split-second exigency existed. Defendants recognized the unreasonable risk to Decedent — the conditions on the Property and the plan to remedy them were set out in writing to Defendant CHERRY in the September 5, 2023 email; Defendant BROCKMAN knew Lee had missed his cardiology appointments and was living in and driving an uninsured and unregistered car; Lee's reliance on charity and from trash bins was known to them; and by April 2024 Lee's condition was formally diagnosed at the hospital as underweight related to food insecurity, with severe muscle wasting — and Defendants actually intended to expose him to those risks without regard to the consequences to him,

prioritizing the payment of abatement-related debts — including $5,000 per month from the conservatorship estate toward the 1-888-Abatement contract balance, for cleanup work Lee had already substantially paid for as alleged in paragraph 43, while the City's $200,000 lien remained against the Property — over his survival.

134. The foregoing policy decisions of Defendant CHERRY, as the County's final policymaker, were the moving force behind the constitutional violations alleged herein: the deprivations flowed directly from those decisions themselves, and would not have occurred absent them.

135. The acts and decisions of Defendant JOSEPH CHERRY constituted the official policy of Defendant COUNTY OF NAPA as alleged in paragraph 12, rendering the COUNTY OF NAPA liable under Monell.

136. As a proximate result of Defendants' conduct, Decedent Leon Schmidt suffered harm, including deprivation of his constitutional rights, prolonged suffering, and inadequate care leading to his death, and Plaintiffs suffered damages as set forth herein, including loss of familial relationship and economic losses. Decedent's claims survive to the Estate pursuant to Code of Civil Procedure § 377.34.

137. Defendants' actions were deliberate, reckless, or with callous indifference, entitling Plaintiffs to punitive damages against the individual Defendants. Plaintiffs are also entitled to attorneys' fees under 42 U.S.C. § 1988.

**THIRD CAUSE OF ACTION**

**(ELDER ABUSE - WELF. & INST. CODE §§ 15600 et seq.)**

**(Against all Defendants, including DOES 1-50; By Plaintiff THE ESTATE OF LEON SCHMIDT)**

138. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as though fully set forth herein.

139. Decedent Leon Schmidt was at all times an "elder" within the meaning of California Welfare and Institutions Code section 15610.27 owing to the fact that he resided in the State of California, and was over 65 years of age.

140. Defendants COUNTY OF NAPA, JOSEPH CHERRY, REBECCA BROCKMAN, and DOE Defendants committed financial abuse of an elder within the meaning of Welfare and Institutions Code section 15610.30(a)(1) and (a)(2), in that they took, secreted, appropriated, obtained, or retained real or personal property of Decedent Leon Schmidt for a wrongful use, and assisted one another in doing so, including by taking control of and liquidating the TD Ameritrade account; failing to marshal the Lake County property so that it could be part of the conservatorship estate; allowing Decedent Leon Schmidt's care credit to lapse and be cancelled; and retaining and controlling the entirety of Decedent Leon Schmidt's financial resources — including the approximately $100,000 held in the conservatorship as of June 2024— while disbursing to him only $1,200 per year, declining to fund the housing plan presented to Defendant CHERRY, and applying his resources to the payment of abatement-related debts — including $5,000 per month from the conservatorship estate toward the balance claimed by 1-888-Abatement for the October 2021 cleanup described in paragraph 43 — rather than to his food, shelter, clothing, and medical care.

141. Pursuant to Welfare and Institutions Code section 15610.30(b), Defendants are deemed to have taken, secreted, appropriated, obtained, or retained the property for a wrongful use because they knew or should have known that this conduct was likely to be harmful to Decedent Leon Schmidt — an elder whom they had themselves represented under oath was unable to properly provide for his personal needs for physical health, food, clothing, or shelter.

142. Pursuant to Welfare and Institutions Code section 15610.30(c), a person or entity takes, secretes, appropriates, obtains, or retains real or personal property when an elder is deprived of any property right, regardless of whether the property is held directly or by a representative of the elder; and pursuant to section 15610.30(d)(1), "representative" means a conservator, trustee, or other representative of the estate of an elder. Defendants COUNTY OF NAPA, JOSEPH CHERRY, and REBECCA BROCKMAN, as conservators of the estate of Decedent Leon Schmidt, were precisely such representatives, and their status as conservators of the estate rather than of the person is no barrier to liability for financial abuse.

143. Defendant THE CITY OF AMERICAN CANYON is liable for financial abuse under Welfare and Institutions Code section 15610.30(a)(2), in that it assisted in the taking, appropriating, obtaining, and retaining of Decedent Leon Schmidt's real and personal property for a wrongful use, including through the seizure and disposal of his personal property during the abatement; the imposition of more than $200,000 in cleanup costs — for work duplicative of, and closely following, the cleanup Lee had already paid a private contractor tens of thousands of dollars to perform, as alleged in paragraph 43 — including $40,000 in legal fees and $20,000 in security costs; the issuance of threatening foreclosure notices; and its initiation of and participation in the conservatorship — calling Adult Protective Services in the summer of 2022, contacting Defendant CHERRY in March 2023 concerning its judgment, requesting in May and June of 2023 that NAPA COUNTY petition for conservatorship over Lee's estate, and coordinating with Defendant CHERRY through the City attorney and code enforcement — undertaken as part of the joint effort alleged in paragraph 13, the purpose of which was to remove Lee from his own property and recover the costs of the cleanup from Lee's estate.

144. In the alternative, once the conservatorship over Decedent Leon Schmidt was established and Defendants took control over his estate, Defendants COUNTY OF NAPA, JOSEPH CHERRY, and REBECCA BROCKMAN were persons "having care or custody of" Decedent Leon Schmidt within the meaning of California Welfare and Institutions Code section 15610.57(a). The care or custody relationship arose because, under Probate Code § 2920(a)(1), the County Defendants were under a mandatory duty to apply for appointment as conservator of the person given the imminent threat to Decedent Leon Schmidt's health or safety established by their own sworn representations in the Petition, and because, having assumed exclusive control of the means by which Decedent Leon Schmidt's basic needs could be met — and having received, at the inception of the conservatorship, the September 5, 2023 email placing Lee's housing squarely within the conservator's charge — they assumed a substantial caretaking and custodial relationship in fact.

145. Defendants committed neglect as defined in Welfare and Institutions Code section 15610.57(b), including failure to assist in personal hygiene, or in the provision of food, clothing, or shelter; failure to provide medical care for physical and mental health needs, including Decedent Leon Schmidt's progressively worsening chronic kidney disease, heart disease, and chronic wounds; failure to protect from health and safety hazards; and failure to prevent malnutrition or dehydration. The malnutrition was not hypothetical: hospital providers formally diagnosed Decedent Leon Schmidt in April 2024 as underweight related to food insecurity, with severe muscle wasting, and his terminal admission records document cachexia and severe protein calorie malnutrition. Pursuant to section 15610.57(c), neglect includes being homeless if the elder is also unable to meet any of the needs specified in section 15610.57(b), and Decedent Leon Schmidt was homeless and unable to meet those needs. The goods and

services Defendants withheld were "goods and services necessary to avoid physical harm or mental suffering" within the meaning of Welfare and Institutions Code section 15610.35, including the provision of medical care for physical and mental health needs, adequately heated and ventilated shelter, protection from health and safety hazards, and protection from malnutrition.

146. Defendants acted with recklessness, oppression, fraud, or malice in the commission of the abuse, in that they made a conscious choice of a course of action — total financial control coupled with a $1,200 annual allowance, no provision for shelter or medical care, non-execution of a housing plan in hand, and application of Decedent's resources to the payment of abatement-related debts at $5,000 per month — with knowledge of the serious danger to Decedent Leon Schmidt involved in it.

147. As a proximate result, Decedent Leon Schmidt suffered physical harm, pain, and mental suffering before his death, and Defendants' actions contributed to his suffering and ultimate death. The Estate is entitled to the remedies provided by the Elder Abuse and Dependent Adult Civil Protection Act, which pursuant to Code of Civil Procedure § 377.34(f) are unaffected by the limitations of § 377.34.

**FOURTH CAUSE OF ACTION**

**(NEGLIGENCE - WRONGFUL DEATH - Cal. Code Civ. Proc. § 377.60)**

**(Against Defendants COUNTY OF NAPA, JOSEPH CHERRY, REBECCA BROCKMAN, and DOES 1-50; By Plaintiffs GARY SCHMIDT, CAROL ADAMS, and SHERI FIHN)**

148. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as though fully set forth herein.

149. Upon appointment as conservator of Leon Schmidt's estate on July 24, 2023, Defendants NAPA COUNTY, JOSEPH CHERRY, REBECCA BROCKMAN,

and DOE Defendants had assumed responsibility for the care, supervision, housing, financial management, and medical treatment of Decedent Leon Schmidt, thereby voluntarily undertaking a special relationship that imposed a duty to use that degree of care and skill that a reasonably prudent person and/or entity would use given the Defendants' respective role, function, knowledge, training, expertise and skill.

150. Defendants additionally owed Decedent Leon Schmidt a duty of care arising from the mandatory obligation imposed by Probate Code § 2920(a)(1) to apply for appointment as conservator of the person given the imminent threat to his health or safety established by their own sworn representations in the Petition; from the special relationship of dependency they created by assuming exclusive control over the resources by which his basic needs could be met; and from the danger they affirmatively created and maintained by rendering and keeping him destitute while controlling substantial assets and a plan to house him.

151. Defendants negligently failed to conform to the standard of care by:

a. Failing to provide Decedent Leon Schmidt with appropriate medical care, including for his progressively worsening chronic kidney disease, heart disease, malnutrition, and chronic wounds;

b. Failing to take adequate measures to provide Decedent Leon Schmidt with safe and adequate housing and shelter, including by failing to execute the housing plan presented directly to Defendant CHERRY in the September 5, 2023 email or any alternative provision for shelter;

c. Failing to provide sufficient financial resources for basic needs, and instead limiting his allowance to an insufficient amount that forced reliance on charity, obtaining food from trash bins, and public facilities, while approximately $100,000 was held in the conservatorship;

d. Failing to notify Decedent Leon Schmidt's known relatives, including his siblings, of the conservatorship proceedings as required by law, thereby preventing family intervention that could have ensured adequate care;

e. Failing to monitor Decedent Leon Schmidt's physical and mental health to ensure he was adequately sheltered, clothed, nourished, hydrated, and protected from health and safety hazards associated with his condition.

152. Defendants' breaches were a substantial factor in causing, and proximately caused, Decedent Leon Schmidt's death on June 29, 2024. Decedent entered the conservatorship with serious chronic medical conditions that were known, documented, and survivable. During the conservatorship, living unsheltered and sleeping upright in a vehicle, he continued to suffer from, and experienced the progression of, the dependent edema, venous stasis, recurrent cellulitis, and chronic wounds that his treating physicians attributed to those living conditions; his kidney function measurably worsened; and by April 2024 he carried a formal hospital diagnosis of underweight related to food insecurity, with severe muscle wasting. On June 14, 2024, he was admitted in a state of extremis with cachexia and severe protein calorie malnutrition, from which context his treating physicians documented that his terminal multiorgan failure and cardiovascular collapse arose. Malnutrition, exposure, and the absence of coordinated care were modifiable conditions; shelter, nutrition, and medical monitoring were available at all times through the resources and the housing plan the Defendants could have implemented; and had those been provided — including through the family intervention that the required statutory notice would have enabled — Decedent's deprivation-driven decline would more likely than not have been arrested or materially slowed, and his death would not have occurred when and as it did.

153. As a direct and legal result of the foregoing, Decedent Leon Schmidt was injured in his health and sustained personal injury leading to his death, and Plaintiffs, and each of them, incurred economic and non-economic damages including, but not limited to, the loss of Decedent Leon Schmidt's care, comfort, support, companionship, love, affection, solace, and moral support.

154. Defendants' conduct was malicious, oppressive, and/or reckless, entitling Plaintiffs to punitive damages. Plaintiffs are also entitled to recover attorneys' fees and costs pursuant to applicable law.

155. As a further and direct result of the foregoing, Decedent Leon Schmidt required extensive medical care and incurred medical expenses in a sum according to proof at trial.

**FIFTH CAUSE OF ACTION**

**(Breach of Fiduciary Duty - Cal. Prob. Code §§ 2101 et seq.)**

**(Against COUNTY OF NAPA, JOSEPH CHERRY, REBECCA BROCKMAN, and DOES 1-50; By Plaintiff THE ESTATE OF LEON SCHMIDT)**

156. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as though fully set forth herein.

157. At all relevant times, Defendants JOSEPH CHERRY and REBECCA BROCKMAN, and DOE Defendants, as appointed conservators of the estate of Decedent Leon Schmidt pursuant to California Probate Code 1800 et seq., were fiduciaries who owed the highest duties of loyalty, care, good faith, and honesty, including the duties to use ordinary care and diligence in managing the estate, to exercise their duties in good faith with reasonable prudence, discretion, and intelligence, and to marshal, preserve, and prudently manage estate assets, in accordance with Probate Code §§ 2401 and 2401.1.

158. Defendants JOSEPH CHERRY and REBECCA BROCKMAN, while employees of NAPA COUNTY, breached their fiduciary duties, causing loss and depreciation in value to the conservatorship estate itself, by, among other things:

a. Taking control of and liquidating the TD Ameritrade account on January 4, 2024, seven days after gaining control of it, thereby causing loss to the estate;

b. Failing to marshal the Lake County property so that it could be part of the conservatorship estate, despite knowledge of the property from August 2023, in a manner the Superior Court itself found did not constitute the use of ordinary care and diligence, thereby causing loss to the estate;

c. Failing to pursue, collect, and apply the insurance proceeds identified in the September 5, 2023 email for the benefit of the estate; and

d. Paying $5,000 per month from the conservatorship estate toward the 1-888-Abatement contract balance without investigating whether the amounts claimed were owed, including in light of the City's duplicative $200,000 charge for the same cleanup work as alleged in paragraph 43, thereby causing further loss to the estate.

159. As a proximate result of the foregoing breaches, the estate of Decedent Leon Schmidt — the plaintiff to which Defendants, as conservators of the estate, owed their fiduciary duties — suffered loss and depreciation in value, and Plaintiff THE ESTATE OF LEON SCHMIDT, as its successor, is entitled to damages in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**

**(Takings Clause Violation - Fifth Amendment under 42 U.S.C. § 1983)**

**(Against Defendant THE CITY OF AMERICAN CANYON and DOES 1-50; By Plaintiff THE ESTATE OF LEON SCHMIDT)**

160. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as though fully set forth herein.

161. Defendant THE CITY OF AMERICAN CANYON and DOE Defendants, acting under color of law, effected a taking of Decedent Leon Schmidt's personal property for public use without just compensation, in violation of the Takings Clause of the Fifth Amendment to the United States Constitution, which is self-executing and applies directly to local governments. *Knick v. Twp. of Scott*, 588 U.S. 180, 189 (2019). Specifically:

a. During the court-ordered cleanup in August and/or September 2022, agents of Defendant CITY OF AMERICAN CANYON permanently appropriated and disposed of the specific items of Decedent Leon Schmidt's personal property identified in paragraph 58, including new merchandise, treasured family heirlooms, and other items stored in structures such as the barn and garage, each of which was not alleged to be a nuisance, cited for violations, or within the scope of the court order authorizing abatement, and each of which fell outside every category enumerated in the Abatement Order for the reasons alleged in paragraph 58;

b. This appropriation constituted a physical taking for a public use — namely, the abatement of alleged public nuisances on the Property — without providing any compensation to Decedent Leon Schmidt;

c. The actions exceeded the legitimate exercise of police power, as they were not necessary to abate an immediate emergency or true nuisance, and

instead amounted to an uncompensated confiscation of private property; and

d. Defendant CITY OF AMERICAN CANYON further burdened the Property by imposing over $200,000 in cleanup costs — for work duplicative of the cleanup Lee had already paid a private contractor to perform, as alleged in paragraph 43 — including $40,000 in legal fees and $20,000 in security costs, and issuing threatening foreclosure notices, substantially interfering with Decedent Leon Schmidt's property rights without just compensation despite their knowing he lacked the mental capacity or physical health to manage the problems at the property himself.

162. As a proximate result of Defendant's conduct, Decedent Leon Schmidt suffered harm, including the permanent loss of valuable property and financial burdens contributing to his declining health and death, and Plaintiffs suffered damages as set forth herein, including economic losses recoverable under the Takings Clause.

163. Plaintiffs are entitled to just compensation, attorneys' fees under 42 U.S.C. § 1988, and other relief as appropriate.

**SEVENTH CAUSE OF ACTION**

**(Procedural Due Process - Fourteenth Amendment under 42 U.S.C. § 1983)**

**(Against Defendants COUNTY OF NAPA, JOSEPH CHERRY, REBECCA BROCKMAN, and DOES 1-50; By Plaintiff THE ESTATE OF LEON SCHMIDT and Plaintiffs GARY SCHMIDT, CAROL ADAMS, and SHERI FIHN)**

164. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as though fully set forth herein.

165. Defendants JOSEPH CHERRY and REBECCA BROCKMAN, and DOE Defendants, acting under color of state law, deprived Leon Schmidt of his protected life,

liberty, and property interests, and deprived Plaintiffs (as siblings and heirs of Decedent Leon Schmidt) of their own protected liberty interests, without procedural due process, in violation of the Fourteenth Amendment to the United States Constitution.

166. This claim does not rest upon California Probate Code § 1822 as the source of a state-created right. Rather, Decedent Leon Schmidt possessed fundamental protected interests arising directly under the Due Process Clause itself, including:

(a) his right to life, as the conservatorship's mismanagement and neglect directly led to the malnutrition, exposure, untreated decline, and unsheltered living conditions documented in his medical records, and to his ultimate death;

(b) his liberty interests in personal autonomy, bodily integrity, freedom from undue restraint, and self-determination, which were curtailed without safeguards, resulting in a massive curtailment of liberty; and

(c) his property interests in the beneficial use, control, and management of his finances and estate, which the conservatorship proceeding extinguished in their entirety when the Superior Court appointed the Public Guardian conservator of his estate with broad independent powers.

167. Plaintiffs GARY SCHMIDT, CAROL ADAMS, and SHERI FIHN additionally possessed constitutionally protected liberty interests in their familial association with their brother.

168. Before the state may work so complete a deprivation — divesting a person of control over his entire estate — the Fourteenth Amendment itself requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections,

together with a meaningful opportunity to be heard. Under the balancing framework of *Mathews v. Eldridge*, 424 U.S. 319 (1976):

> (a) the private interests at stake — for Leon Schmidt, his life, personal security, autonomy, and financial resources; for Plaintiffs, their familial liberty — were profound and fundamental, involving risks of neglect, harm, death, and estate dissipation;
>
> (b) the risk of erroneous deprivation was extraordinarily high without the required notice, as an ex parte process denies adversarial input, family advocacy, and safeguards against neglect or mismanagement, and additional procedural safeguards like notice had high probable value in reducing errors — particularly here, where the family members known to Defendants included an experienced cardiac care nurse and siblings who had offered Decedent housing and who, as the Superior Court found, would all have attended the hearing had they known of it; and
>
> (c) the governmental burden of providing the notice — notice the State's own statute already mandated — was minimal, aligning with rather than conflicting with the state's interest in protecting vulnerable individuals, especially given Defendants' awareness of Leon Schmidt's diminished capacity and the fact that he had siblings.

169. Defendants provided no notice of the conservatorship petition, hearings, or subsequent orders to Decedent's siblings, as the Superior Court expressly found in its Order After Hearing, filed June 9, 2025, and no adequate pre-deprivation process was afforded, causing Decedent and Plaintiffs to lose the opportunity to be heard, present evidence, challenge the petition, or advocate for adequate care, housing, medical needs, and prudent financial management. Post-deprivation process was constitutionally

inadequate because the deprivation was effected pursuant to Defendants' deliberate and established decision and procedure — Defendants CHERRY and BROCKMAN made a deliberate decision not to give the required notice — rather than by random and unauthorized acts, and because the harms were irreversible by any post-deprivation process: Leon Schmidt is dead, his life and liberty irretrievably lost, and the harm irreversible by any post-deprivation remedy.

170. This procedural defect directly caused the deprivations: For Leon Schmidt, it left the conservatorship's administration unchecked by any family advocate while he descended into the documented malnutrition and deprivation described above, and while the housing plan of September 5, 2023 sat unexecuted, culminating in his death and the loss of his liberty and property; for Plaintiffs, it prevented intervention that could have preserved familial ties, ensured proper care, and protected the estate from mismanagement, resulting in the loss of companionship and inheritance.

171. The acts and decisions of Defendant JOSEPH CHERRY constituted the official policy of Defendant COUNTY OF NAPA as alleged above, rendering the COUNTY OF NAPA liable under Monell.

172. The foregoing policy decisions of Defendant CHERRY, as the County's final policymaker, were the moving force behind the constitutional violations alleged herein: the deprivations flowed directly from those decisions themselves, and would not have occurred absent them.

173. Defendants' actions were deliberate, reckless, or with callous indifference to the rights of Decedent Leon Schmidt and Plaintiffs, entitling Plaintiffs to punitive damages against the individual Defendants. Plaintiffs are also entitled to attorneys' fees under 42 U.S.C. § 1988

**EIGHTH CAUSE OF ACTION**

**(Conversion)**

**(Against Defendant THE CITY OF AMERICAN CANYON and DOES 1-50; By Plaintiff THE ESTATE OF LEON SCHMIDT)**

174. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as though fully set forth herein.

175. Decedent Leon Schmidt owned and had the right to possess the items of personal property identified in paragraph 58, including the new merchandise and treasured family heirlooms stored in the barn, garage, and other structures on the Property.

176. Defendant THE CITY OF AMERICAN CANYON, by its agents, converted that property by a wrongful act and disposition of Decedent Leon Schmidt's property rights, intentionally seizing, removing, and disposing of it during the August and/or September 2022 cleanup. The disposition was wrongful because the items identified in paragraph 58 were stored within structures that were not subject to any allegations of code violations, citations, or the Court order permitting the cleanup, were outside the categories and scope of the Abatement Order, and no legal authority otherwise justified their taking or destruction.

177. As a proximate result, Decedent Leon Schmidt was damaged in the amount of the value of the converted property, together with consequential damages, all of which survive to the Estate pursuant to Code of Civil Procedure § 377.34. Plaintiffs presented their claims encompassing this conduct to the City pursuant to Government Code § 910 et seq.

**NINTH CAUSE OF ACTION**

**(Survival Action - Code of Civil Procedure § 377.34)**

**(Against All Defendants, including DOES 1-50; By Plaintiff THE ESTATE OF LEON SCHMIDT)**

178. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as though fully set forth herein.

179. Each cause of action that Decedent Leon Schmidt possessed at the time of his death — including his claims under the Fourth, Fifth, and Fourteenth Amendments pursuant to 42 U.S.C. § 1983, his claim for elder abuse under Welfare and Institutions Code §§ 15600 et seq., and his claim for conversion — was not lost by reason of his death, and no pending action abated by his death. Those causes of action are asserted by his personal representatives, Co-Administrators Gary Schmidt and Carol Adams, on behalf of the Estate.

180. Pursuant to Code of Civil Procedure § 377.34(a), the damages recoverable include all loss or damage that Decedent sustained or incurred before death — including his lost property, medical expenses, and other pecuniary losses incurred before death — including any penalties or punitive or exemplary damages that Decedent would have been entitled to recover had he lived. Pursuant to the term-limited exception of Code of Civil Procedure § 377.34(b), because this action was filed on or after January 1, 2022, and before January 1, 2026, the damages recoverable additionally include damages for Decedent's pain, suffering, or disfigurement — which here include the prolonged suffering of malnutrition, exposure, and chronic wounds, and the fifteen-day terminal hospitalization documented in the medical records.

WHEREFORE, Plaintiffs pray judgment against Defendants, and each of them, as follows:

a. For noneconomic damages according to proof at time of trial;

b. For economic damages according to proof, including funeral and burial expenses and the losses to the Estate;

c. For damages for Decedent's pre-death pain, suffering, and disfigurement pursuant to Code of Civil Procedure § 377.34(b);

d. For the enhanced remedies available under Welfare and Institutions Code §§ 15600 et seq.;

e. For just compensation under the Fifth Amendment;

f. For punitive and exemplary damages against the individual Defendants;

g. For attorneys' fees pursuant to 42 U.S.C. § 1988 and Welfare and Institutions Code §§ 15600 et seq.;

h. For costs of suit; and

i. For such other and further relief as the Court deems just and proper.

Dated: September 16, 2025

By: _Luke Bubsy, Esq._

Barry Melton, Esq.
California Bar #104700
PO Box 116
Petaluma, CA 94953-0116
530-304-9192
thefish@counterculture.net

Luke Busby, Esq.
Nevada Bar #10319
316 California Avenue
Reno, Nevada 89509
(775) 453-0112
luke@lukeandrewbusbyltd.com
*Admitted Pro Hac Vice*

Michael S. Biggs, Esq.
California Bar #237640
Biggs Law Office

319 Lennon Lane
Walnut Creek, CA 94598
(925) 933-1300
michaelbiggs@biggslawoffice-apc.com

*Attorneys for the Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on each and all of the causes of action set forth in this Complaint.

Dated: September 16, 2025


By: */s/ Luke Busby, Esq.*
Barry Melton, Esq.
California Bar #104700
PO Box 116
Petaluma, CA 94953-0116
530-304-9192
thefish@counterculture.net

Luke Busby, Esq.
Nevada Bar #10319
316 California Avenue
Reno, Nevada 89509
(775) 453-0112
luke@lukeandrewbusbyltd.com
*Admitted Pro Hac Vice*

Michael S. Biggs, Esq.
California Bar #237640
Biggs Law Office
319 Lennon Lane
Walnut Creek, CA 94598
(925) 933-1300
michaelbiggs@biggslawoffice-apc.com

*Attorneys for the Plaintiffs*

## Exhibit List

1. Order Appointing Co-Administrators (Napa Superior Court, Case No. 24PR000326): Order dated March 20, 2025, appointing Carol J. Adams and Gary R. Schmidt as co-administrators of the Estate of Leon Dale Schmidt

2. Notice of Rejection of Claim - Sheri Fihn (City of American Canyon, Claim No. 3092465): Rejection letter dated February 13, 2025

3. Notice of Rejection of Claim - Estate of Leon "Lee" D. Schmidt (City of American Canyon): Rejection letter dated February 13, 2025

4. Notice of Rejection of Claim - Gary Schmidt (City of American Canyon, Claim No. 3092465): Rejection letter dated February 13, 2025

5. Notice of Rejection of Claim - Carol Adams (City of American Canyon, Claim No. 3092465): Rejection letter dated February 13, 2025

6. Notice of Rejection of Claim - Carol Adams (County of Napa, GHC Claim No. GHC0097212): Rejection notice dated February 12, 2025

7. Notice of Rejection of Claim - Estate of Leon D. Schmidt (County of Napa, GHC Claim No. GHC0097212): Rejection notice dated February 12, 2025

8. Notice of Rejection of Claim - Gary Schmidt (County of Napa, GHC Claim No. GHC0097212): Rejection notice dated February 12, 2025

9. Notice of Rejection of Claim - Sheri Fihn (County of Napa, GHC Claim No. GHC0097212): Rejection notice dated February 12, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on the date below, I caused a true and correct copy of the foregoing to be served on all counsel of record via the Court's CM/ECF system and courtesy copy by US Mail to:

United States District Court
Office of the Clerk
450 Golden Gate Ave, 16th Floor
San Francisco, CA 94102

Dated: September 16, 2025

By: *<u>/s/ Luke Busby, Esq.</u>*